UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TIM SANTILLANES,<br><br>        Plaintiff,<br><br>   v.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>        Defendant. | Case No. 4:12-CV-000627-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

This matter is before the Court on Plaintiff Tim Santillanes' ("Plaintiff") Motion for Partial Summary Judgment (Dkt. 25), Plaintiff's Motion to Strike Affidavit filed in Opposition to Motion for Summary Judgment (Dkt. 41), Motion for Leave to File Declaration of Tim Santillanes (Dkt. 46), and Joint Motion to Continue Trial (Dkt. 58).[1]

The parties have submitted their briefing on the motions and the matter is now ripe for the Court's review. Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the motions shall be decided on the record before this Court without oral argument.

---

[1] The Court has not considered either Plaintiff's Motion in Limine (Dkt. 33) or Defendant's Motion in Limine (Dkt. 39). The Court will rule on such motions during or shortly before trial.

I.      **Factual Background**

Plaintiff began working for Defendant Union Pacific Railroad Company ("Union Pacific") in 1978. (Dkt. 26-3, p. 10, ll. 10.) On January 7, 2010, the day of his accident, Plaintiff was working as an EC-4 geometry car ("EC-4") operator.[2] (Dkt. 26-1, ¶ 1); (Dkt. 36, p. 5.) The EC-4 is a rail-bound test car. (Dkt. 37, ¶ 4.) The EC-4 is about 86 feet long and weighs approximately 100 tons. (*Id.*) Geometry cars like the EC-4 can be self-propelled, and can also be towed by a locomotive. (*Id.*) On the day of Plaintiff's accident, the EC-4 was self-propelled.[3] (*Id.*) Geometry cars such as the EC-4 are not a part of Union Pacific's through-freight transportation service, and are not designed to pull or haul freight or equipment. (*Id.*, ¶ 12.) On the day of Plaintiff's accident, the EC-4 was not pulling or hauling anything. (*Id.*)

On the day of his accident, Plaintiff and the rest of the EC-4 crew and supervisors stopped to re-fuel near Gaviota, California, on Union Pacific's track near milepost 336. (Dkt. 26-1, ¶ 2.) Union Pacific's track runs parallel to the Pacific Ocean, and the EC-4

---

[2] "EC" stands for evaluation car. (Dkt. 26-3, p. 29, ll. 10.)

[3] The EC-4 is used to capture information about the condition of the railroad tracks and the railroad right of way for track maintenance purposes. (Dkt. 37, ¶ 5.) The geometry cars can measure and test track geometry, rail wear, rail head profile, and rail cant. (*Id.*) A video system on board the geometry car takes a digital video of the railroad right-of-way. Tunnel lasers measure the track centers of adjacent tracks, as well as ballast profiles. (*Id.*, ¶ 5.) Each geometry car has fourteen seats arranged in rows and slightly elevated, such as in a theater. (*Id.*, ¶ 8.) Two operators sit in the front of the cab. One operator drives while the other operator enters track data, speed limit changes, location of bridges, mile posts, tunnels, signals, and other such data. (*Id.*) In the interior of the geometry car, there is a kitchen area, a computer room, a restroom, a generator room, a small tool room, and a small supply storage room. (*Id.*, ¶ 9.)

stopped on the track a few hundred yards away from a cliff.  (*Id.*)  Plaintiff had to urinate during the re-fueling stop, and, after exiting the EC-4 after another employee asked him for assistance outside the machine, Plaintiff stopped to relieve himself about 4-6 feet away from the cliff.  (Dkt. 1, ¶ 9; Dkt. 26-1, ¶¶ 5-6.)  After Plaintiff relieved himself, he was returning to the EC-4 when the ground beneath him collapsed.  (Dkt.26-1, ¶ 6.)  As a result of the collapse, Plaintiff fell approximately 100 feet to the beach below and sustained severe injuries, including a broken arm, dislocated shoulder, torn rotator cuff, lacerations, four broken ribs, sprained ankles, road rash, and abrasions on his head and back.  (Dkt. 1, ¶ 13.)

Plaintiff alleges that he chose to urinate outside—rather than returning inside to use the toilet compartment of the EC-4—because the EC-4's toilet compartment was unsanitary.  Specifically, the EC-4's lavatory utilizes an incinerator system that burns human waste.  (Dkt. 26-1, ¶ 3.)  As a result, the lavatory produces smells of burnt liquid and solid human waste so odoriferous employees cannot use it.  (*Id.*)  Further, the toilet frequently overflowed.  (*Id.*)  As a result of the terrible smells produced by the EC-4 lavatory, Plaintiff alleges Union Pacific allowed its employees to go outside of the test car to relieve themselves, and that this was not a violation of Union Pacific's rules or regulations.  (*Id.*, ¶ 4.)  Moreover, Plaintiff claims his supervisor, Andrew Gonzales ("Gonzales"), relieved himself in approximately the same location 4-6 feet from the edge of the cliff a few minutes before Plaintiff relieved himself there.  (*Id.*, ¶ 5.)  Finally,

Plaintiff notes Union Pacific was aware the location where the EC-4 stopped on the tracks was a dangerous area.[4]  (*Id.*)

In the instant motion, Plaintiff seeks partial summary judgment finding Union Pacific violated the Locomotive Inspection Act, 49 U.S.C. § 20701, in failing to provide a sanitary lavatory on the EC-4, and that such failure caused Plaintiff's injuries.

## STANDARD OF REVIEW

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure.  Rule 56 provides that judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  According to Rule 56, an issue must be both "material" and "genuine" to preclude entry of summary judgment.  An issue is "material" if it affects the outcome of the litigation.  *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975).  That is, a material fact is one that is relevant to an element of a claim or defense which might affect the outcome of the suit.  The materiality of a fact is thus determined by the substantive law governing the claim or defense.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Anderson v.*

---

[4] Union Pacific disputes many of these allegations, claiming there is no evidence that Union Pacific employees could not use the lavatory because of an odor, nor that Union Pacific was aware of such odor. (Dkt. 36, p. 5.) Union Pacific also challenges Plaintiff's characterization of the odor produced by the incinerator and maintains the toilet did not overflow. (*Id.*, pp. 6-7.) Union Pacific also disputes both that Gonzales was Plaintiff's supervisor and that Gonzales urinated in approximately the same location as Plaintiff shortly before Plaintiff's accident. (*Id.*, pp. 7-8.) Finally, Union Pacific claims the evidence does not support Plaintiff's allegation that Union Pacific was aware the location of the accident was a dangerous area. (*Id.*)

*Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  *Id*.

On the other hand, an issue is "genuine" when there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *Hahn*, 523 F.2d at 464 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co*., 391 U.S. 253, 289 (1968)).  Because factual disputes are to be resolved at trial, in ruling on summary judgment motions, the Court does not resolve conflicting evidence with respect to disputed material facts, nor does it make credibility determinations.  *T.W. Elec. Serv., Inc*., 809 F.2d at 630.  Such determinations are within the province of the factfinder at trial.  Therefore, when deciding a motion for summary judgment, "the judge must view the evidence in the light most favorable to the nonmoving party."  *Id*.

Pursuant to Federal Rule of Civil Procedure 56(a), a party may move for summary adjudication on part of a claim or defense.  The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment.  *See* Fed.R.Civ.P. 56(a); *Mora v. Chem-Tronics*, 16 F.Supp.2d 1192, 1200 (S.D. Cal. 1998).  Accordingly, the Court may grant summary adjudication upon a showing that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating that it is entitled to summary adjudication. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970).  The burden then shifts to the nonmoving

party to show that summary judgment is not appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## DISCUSSION

*A. Legal Framework*

Plaintiff brings this suit under the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 *et. seq.* and the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701 *et. seq.*[5] Under FELA, a railroad carrier is liable for injury to an employee resulting "in whole or in part" from the negligence of the carrier. 45 U.S.C. § 51. The Supreme Court has recognized a "relaxed standard of causation" under FELA. *CSX Transp., Inc. v. McBride*, 131 S.Ct. 2630, 2636 (2011). Thus, although a FELA plaintiff must offer evidence providing the common law elements of negligence, the quantum of evidence that suffices in FELA cases is significantly lower than in ordinary tort cases. Specifically, a railroad carrier will be found to have violated FELA where its negligence played any part, however small, in the injury or death which is the subject of the suit. *Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 506 (1957) ("Under [FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer

---

[5] Although Plaintiff's complaint does not list violation of the LIA as a separate claim, the facts supporting Plaintiff's FELA claim are the same as those supporting an LIA claim. Further, safety statutes such as the LIA do not create an independent cause of action, but supplement FELA by imposing on railroads an absolute and continuing duty to provide safe equipment. *Matson v. Burlington Northern Santa Fe. R.R.*, 240 F.3d 1233, 1235 (10th Cir. 2001). A claim for a violation of the LIA must accordingly be brought under FELA. *Id.*; *see also Urie v. Thompson*, 447 U.S. 163, 188 (1949) (the LIA does not purport to confer any independent right of action upon injured employees).

negligence played any part, even the slightest, in producing the injury or death for which damages are sought.").

While the basis of liability under FELA is negligence, certain safety statutes impose strict liability on railroad carriers for violation of safety standards. The employee's contributory negligence and assumption of the risk are precluded as defenses where the railroad's violation of a statute enacted for the safety of employees contributed to the injury or death of such employee. *See, e.g.*, 49 U.S.C. § 20304; *Kernan v. American Dredging Co.*, 355 U.S. 426, 433 (1958). Thus, once a safety law violation is established, the injured worker is entitled to summary judgment even though the worker may have also violated a similar safety law. *Id*. The federal safety statutes at issue in this case are the LIA and the Federal Safety Appliance Act ("FSAA"),[6] 49 U.S.C. § 20301 *et. seq*. The FSAA and LIA are regarded as amendments to FELA which provide additional public protection and facilitate employee recovery. *Urie v. Thompson*, 337 U.S. 163, 189 (1949).

The FSAA requires railroads to equip any vehicle used on a railroad line with basic safety equipment.[7] The carrier's failure to provide such safety appliances, or the

---

[6] The FSAA was formerly codified at 45 U.S.C. § 1 and is frequently referred to as the Safety Appliance Act.

[7] In general, rail cars must be equipped with automatic couplers, secure sill steps, efficient hand brakes, secure ladders and running boards when required by the Secretary, if secure ladders are required, secure handholds or grab irons on car roofs at the top of each ladder, and standard height drawbars. 49 U.S.C. § 20302(a)(1)-(3). Locomotives must be equipped with adequate brakes to their driving wheels and appliances necessary to operate a train brake system. 49 U.S.C. § 20302(a)(4).

MEMORANDUM DECISION AND ORDER

failure of these appliances to perform, is a violation of federal law, giving rise to a FELA cause of action. Once a violation of the FSAA has been established, the only remaining issue is whether the violation played any role in producing the plaintiff's injury. *Myers v. Reading Co.*, 331 U.S. 477, 482-83 (1947).

Under the LIA, a locomotive may only be used on a railroad line when "its parts and appurtenances…are in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701(1). The Secretary of Transportation (the "Secretary"), acting through the Federal Railroad Administration ("FRA"), is responsible for the administration and enforcement of railroad safety laws, including the LIA. *Id.*, § 20702, 20703(a).

Acting under its statutory authority, the FRA has promulgated Railroad Locomotive Safety Standards ("Standards"). 49 C.F.R. 229. The Standards establish requirements governing the inspection, design, equipment, and operation of locomotives. One such requirement is that locomotives must be equipped with a sanitary toilet for use by employees while on duty.[8] 49 C.F.R. § § 229.137 and 229.139. Unlike the LIA, the

---

[8] Pursuant to 49 C.F.R. § 229.5, "sanitary" means:

[L]acking any condition in which any significant amount of filth, trash, or human waste is present in such a manner that a reasonable person would believe that the condition might constitute a health hazard; or of strong, persistent, chemical or human waste odors sufficient to deter use of the facility, or give rise to a reasonable concern with respect to exposure to hazardous fumes. Such conditions include, but are not limited to, a toilet bowl filled with human waste, soiled toilet paper, or other products used in the toilet compartment, that are present due to a defective toilet facility that will not flush or otherwise remove waste; visible human waste residue on the floor or toilet seat that is present due to a toilet that

(Continued)

MEMORANDUM DECISION AND ORDER

FSAA does not contain a statutory or regulatory provision requiring sanitary lavatory facilities.

The LIA is only applicable to locomotives, while the FSAA applies more generally to railroad vehicles used on railroad lines. 49 U.S.C. §§ 20301 to 20306. The FSAA defines "vehicle" as "a car, locomotive, tender, or similar vehicle." *Id*., § 20301(a). By contrast, the LIA does not define "locomotive." However, the Standards expressly exclude "specialized maintenance equipment" from the definition of locomotive under the LIA. Specifically, 49 C.F.R. 229.5 provides:

> Locomotive means a piece of on-track equipment *other than hi-rail, specialized maintenance or other similar equipment*—
> 1. With one or more propelling motors *designed for moving other equipment*;
> 2. With one or more propelling motors *designed to carry freight or passenger traffic or both*; or
> 3. Without propelling motors but with one or more control stands.

49 C.F.R. 229.5 (emphasis added).

Although the Supreme Court has held the FSAA and LIA should be read and applied together, *Urie*, 337 U.S. at 189, to recover for a violation of either the FSAA or the LIA, a plaintiff must show that the railroad maintained equipment covered under the statute in a defective or unsafe condition, and that the plaintiff suffered injuries in whole or in part from the statutory violation. *Tootle v. CSX Transp., Inc.*, 746 F.Supp.2d 1333,

---

> overflowed; an accumulation of soiled paper towels or soiled toilet paper on the floor, toilet facility, or sink; and accumulation of visible dirt or human waste on the floor, toilet facility, or sink; and strong, persistent chemical or human waste odors in the compartment.

1341 (S.D.Ga. 2010) (citing *Richards v. Consol. Rail Corp.*, 330 F.3d 428, 432 (6th Cir. 2003); *see also Mosco v. Baltimore & Ohio R.R.*, 817 F.2d 1088, 1091 (4th Cir. 1987) (A railroad carrier cannot be held liable under the LIA for failure to install equipment on a locomotive unless the omitted equipment is required by applicable regulations or constitutes an integral or essential part of a completed locomotive).

## ANALYSIS

In order to grant Plaintiff's Partial Motion for Summary Judgment, the Court must find as a matter of law that the EC-4 was a "locomotive," that Union Pacific violated the LIA by providing an unsanitary lavatory, and that this violation was the cause of Plaintiff's injury. *Szekeres v. CSX Transp., Inc.*, 731 F.3d 592, 599 (6th Cir. 2013).[9] Although the Court notes there appear to be disputed material facts precluding summary judgment as to the latter two elements,[10] the Court need not address such elements because it finds the EC-4 is not a locomotive under the LIA as a matter of law. *Steer v. Burlington N. Inc.*, 720 F.2d 975, 977, n. 4 (8th Cir. 1983) (whether the LIA applied was a question of law for the district court) (applying the Boiler Inspection Act, the precursor to the LIA).

---

[9] Plaintiff relies upon *Szekeres* because the court there held a railroad breached the LIA when it failed to provide a sanitary lavatory and that such failure caused an employee injury when he exited the locomotive to relieve himself, and slipped on mud the railroad had failed to cover with ballast. (Dkt. 26, pp. 6-7.) However, as Union Pacific notes, *Szekeres* involved the condition of a lavatory on a locomotive, not on a "specialized maintenance vehicle," such as the EC-4. (Dkt. 36, p. 10.)

[10] *See, supra*, text accompanying note 4.

Courts interpreting the LIA have "consistently held that a vehicle will be considered a locomotive only if it is used as a locomotive." *Garcia v. Burlington N.R. Co.*, 818 F.2d 713, 715 (10th Cir. 1987)[11] (citing *Baltimore & O. Ry. v. Jackson*, 353 U.S. 325, 329 (1957); *Hoffman v. New York, N.H. & H.R.R.*, 74 F.2d 227, 232 (2d Cir. 1934); *Duchsherer v. Northern Pac. Ry.*, 481 P.2d 929, 932 (Wash.App.1971)). In *Garcia*, the Tenth Circuit noted the cases finding the LIA applicable reveal two requirements: first, the vehicle must operate on railroad tracks[12]; and second, it must perform a locomotive function. *Id*. The EC-4 meets the first criteria because it operated on railroad tracks. The critical issue is thus whether the EC-4 performed a "locomotive function."

The *Garcia* court and numerous other courts have held that vehicles that push or pull railroad cars along railroad tracks perform locomotive functions. *Id*. In *Garcia*, the court considered whether a Tamper, a vehicle designed to align tracks, could be considered a locomotive. When performing its function of aligning tracks, the Tamper utilized two metal apparatus: a projector buggy pushed along the track and a receiver buggy permanently installed on the rear of the Tamper. *Id*. However, the buggies were an integral part of the Tamper's special design; without the projector buggy and receiver buggy, the Tamper could not carry out its track aligning tasks. The Tamper did not haul

---

[11] *Garcia* was also decided under the Boiler Inspection Act.

[12] The operating on railroad tracks requirement was first defined in *Mazzucola v. Pennsylvania R.R.*, 281 F.2d 267 (3d Cir. 1960), in relation to a caterpillar that was used to push and pull railroad cars to and from a loading dock. The Third Circuit held that, because the caterpillar "runs on its own tracks, not those of the railroad," it was not a locomotive. *Id*. at 268-69.

MEMORANDUM DECISION AND ORDER

or push any vehicles other than the buggies while performing its function. The *Garcia* court thus determined "the pushing and pulling done by the Tamper is not the same conveyance pushing or pulling normally done by a locomotive." *Id*. at 716. The court further explained:

> [A]ny pushing or pulling at the job site is integral to the Tamper's special work site function…the Tamper must have its appurtenances to perform its specialized function. Therefore, we conclude that the Tamper performs no locomotive function, even though it operates on a railroad track. While we recognize that the [LIA] should be liberally construed, its coverage cannot be extended indefinitely. For purposes of the [LIA], the Tamper is not a locomotive. Since the Tamper is not a locomotive, defendant is not subject to, and plaintiff cannot recover under, the [LIA].

*Id*. at 720.

Courts interpreting the term "locomotive," under both the LIA and FSAA, have also determined the fact that a vehicle operates on railroad tracks is not enough to establish that the vehicle is a locomotive; the vehicle must also perform locomotive function. For instance, in *U.S. v. Fort Worth & Denver City Ry. Co*., 21 F.Supp. 916 (N.D. Tex. 1937), the court considered whether defendant railroad violated the FSAA by operating a steam locomotive crane on its tracks without equipping the crane with a power driving wheel brake.[13] Defendant railroad was engaged in construction upon its train line. In conveying the heavy boulders needed for the construction work from the switch to the construction site, defendant utilized a steam locomotive crane to haul cars

---

[13] The defendant was charged with violating § 1 of the former Safety Appliance Act, which provided, "[i]t shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system[.]" *Id*. at 917.

loaded with the boulders to the site, unload the boulders where they were needed, return to the switch, pick up other cars loaded with boulders, and move them to the construction site. Defendant railroad argued, *inter alia*, that the crane was not a locomotive within the meaning of the FSAA because the operations it performed were not train movements. The court agreed that "while the equipment is being used as a crane, and moved about at the scene of construction, it is still a crane and does not become a locomotive[.]" *Id*. at 918. However, when the crane was "used to haul cars for a distance up to two and one-half miles from a switch to the scene of construction," it was "being used for the purposes for which a locomotive is used and is a locomotive within the meaning of the [statute]." *Id*. The court concluded, "[w]hile the equipment is being used as a locomotive it is a locomotive, regardless of whatever else it might also be." *Id*. Under *Fort Worth*, a vehicle operates as a locomotive when it hauls cars loaded with materials on a railroad track.

In *Baltimore & O. Ry. v. Jackson*, 353 U.S. 325 (1957) (hereinafter "*Jackson*"), the Supreme Court considered whether a four-motor track car and the four-push truck towed by it were subject to FSAA coupling and brake requirements for locomotives. The Court noted "the controlling factor" in determining applicability of the Safety Appliance Acts to vehicles in a railroad's service "is the type of operation for which they are being used."[14] *Id*. at 329. At the time of respondent's injury, the railroad was putting the motor

---

[14] Plaintiff in *Jackson* alleged his injuries were caused by defendant railroad's noncompliance with the requirements of both the FSAA and the LIA.

track car to "locomotive uses in pulling a hand car used to haul materials, tools and equipment." *Id*. The Court held:

> [W]hen the railroad uses this type of equipment in this manner—regardless of the label it places on the vehicles—the commands of the Acts must be obeyed. The operation as conducted when the respondent was injured, with a motor track car equipped with neither power nor train brakes pulling an attached hand car with neither an automatic coupler nor hand brake, was in defiance of the requirements of the Acts.

*Id*.

Notably, the Jackson court did not find the motor track car was subject to the LIA simply because it *could* be used as a locomotive. Instead, the Court found the LIA applicable because, at the time of the injury, the petitioner "was putting the motor track car to locomotive use in pulling a hand car to haul material, tools and equipment." *Id*. at 329.

Other courts have also held that vehicles that push or pull railroad cars carrying passengers or some type of cargo or equipment along railroad tracks are locomotives. In *Hoffman v. New York, N.H. & H.R. Co*., 74 F.2d 227, 232 (2d Cir. 1934), the Second Circuit determined a gasoline engine frequently used for hauling a long line of cars was a "locomotive" under the Boiler Inspection Act and Safety Appliance Act. The Tenth Circuit similarly held a self-propelled crane used by a railroad to pull two push cars and push one flat car, loaded with material to be unloaded and used in conjunction with the crane, over tracks, "was being operated or used as a locomotive" in *Atchison, T. & S. F. Ry. Co. v. U. S*., 403 F.2d 211, 212 (10th Cir. 1968).[15] In a personal injury action by

---

[15] The *Atchison* court held the requirement of the FSAA that locomotives have "power driving-wheel brakes" was thus applicable to the self-propelled crane. *Id*.

railroad worker, the trial court held, and the Supreme Court of Alabama affirmed, that a self-propelled burro crane involved in an accident was a locomotive within the meaning of the LIA, where the crane operated on railroad tracks, pushing and pulling a tool car loaded with materials to be used in conjunction with the crane. *Illinois Cent. Gulf R. Co. v. Haynes*, 592 So.2d 536 (Ala. 1991).[16] In so holding, the court stated, "the burro crane runs on the tracks and pushes and pulls a tool car and, therefore, meets the criteria for being considered a locomotive, as a matter of law." *Id*. at 544. Finally, in *Duchsherer v. Northern Pac. Ry. Co.*, 481 P.2d 929 (Wash. App. 1971) the court determined a self-propelled, one-ton motor car designed to both carry people to their work and, when coupled with push cars, to pull around loads of material those people might need in their work, was a locomotive for purposes of the LIA. In so holding, the *Duchsherer* court noted that the Interstate Commerce Commission "with its particular expertise in the area of railroad regulation," has also prescribed a "functional definition of locomotive." *Id*. at 932-33 (citing 297 ICC 177, 190 (1955); 325 ICC 722 (1965)).

The cases illustrate that whether the LIA applies to a particular vehicle, such as the EC-4, depends on the use of the vehicle. The employment of the vehicle at the time of injury is crucial to determining whether that vehicle is subject to the LIA and to its

---

[16] The Illinois Central Court distinguished its holding from *Garcia*, noting, unlike the Tamper considered in *Garcia*, the self-propelled crane "does not have a particular function of its own, as it usually pushes a cart which is not part of its design." *Id*. at 544. The EC-4, like the Tamper considered in *Garcia*, does have its own function, to evaluate the railroad tracks for maintenance purposes, and, unlike the Tamper in *Garcia* or the crane in *Illinois Cent.*, was not being used to pull or haul any cars on the day of Plaintiff's accident.

MEMORANDUM DECISION AND ORDER

accompanying regulations. The facts in the present case regarding the use of the EC-4 are undisputed. The EC-4 was being used to conduct track maintenance activities and was not pushing or pulling anything at the time of Plaintiff's accident. Although the EC-4 can be towed by a locomotive, it was self-propelled and was not attached to a locomotive at the time of the accident. Further, the EC-4 is not designed to pull or haul freight or equipment, and was not pulling or hauling anything on the day of Plaintiff's accident. On the day in question and during the accident, the EC-4 was thus undisputedly exclusively used as a maintenance vehicle, and was not used as a locomotive. The LIA accordingly does not apply.

The Court understands and appreciates that federal railroad legislation, including the LIA, has "the humanitarian purpose of protecting workers and other persons from harm caused by defective railroad equipment," and should accordingly be interpreted liberally. *Duchsherer*, 481 P.2d at 932(citing *Urie*, 337 U.S. 163; *Lilly v. Grand Trunk Western R. Co.*, 317 U.S. 481, 486 (1943) ("The [LIA] like the [FSAA], is to be liberally construed in the light of its prime purpose, the protection of employees and others by the use of safe equipment.")). However, the Court has not located, and Plaintiff has not cited, any case finding that a vehicle, like the EC-4, which was not pushing or hauling anything, nor performing any other locomotive function at the time of an accident, was a locomotive for purposes of the LIA.

Moreover, the definition for locomotive more recently set forth by the FRA specifically excludes "specialized maintenance equipment" such as the EC-4.[17] 49 C.F.R. § 229.5 ("Locomotive means a piece of on-track equipment *other than hi-rail, specialized maintenance*, or other similar equipment…")(emphasis added). The FRA has established regulations to prevent accidents and casualties to employees, like Plaintiff, who are involved "in certain railroad inspection, maintenance and construction activities." 49 C.F.R. § 214.1. These regulations apply to "roadway maintenance machines," such as the EC-4.[18] Regulations applicable to roadway maintenance machines require railroads to adopt "specific provisions for the safety of roadway workers who operate or work near roadway maintenance machines." 49 C.F.R. § 214.341(a). Such provisions address matters including the training and qualification of operators of roadway maintenance machines, spacing between machines to prevent collisions, and maximum working and travel speeds dependent upon weather, visibility and stopping capabilities. 49 C.F.R. § 214.341(a); 49 C.F.R. § 214.355. Such regulations do not, however, impose the sanitary lavatory criteria required of locomotives under the LIA.

---

[17] The cases discussed herein predate the passage of 49 C.F.R. 229.5.

[18] The regulations define roadway maintenance machine as "a device powered by any means of energy other than hand power which is being used on or near railroad track for maintenance, repair, construction or inspection of track, bridges, roadway, signal, communications, or electric traction systems. Roadway maintenance machines may have road or rail wheels or may be stationary." 49 C.F.R. § 214.7. The Court finds the EC-4, which was self-propelled and was used on the railroad track to perform inspection for maintenance purposes, is a roadway maintenance machine.

MEMORANDUM DECISION AND ORDER

In sum, the LIA does not apply to the EC-4 because it is not a locomotive and was not being used in a locomotive capacity at the time of Plaintiff's accident. Although, as a roadway maintenance vehicle, certain FRA regulations apply to the EC-4, the requirements of 49 C.F.R. §229.137 and 49 C.F.R. § 229.139(a) that *locomotives* be adequately equipped with a sanitary lavatory facility do not apply to the EC-4. The Court accordingly denies Plaintiff's Motion for Partial Summary Judgment. Since the EC-4 is not a locomotive, Plaintiff cannot recover under the LIA. However, Plaintiff may still recover under FELA, provided he can establish at trial that Union Pacific was negligent and that such negligence played a part, "even the slightest," in causing his injury. *Szekeres*, 731 F.3d 592, 602 (quoting *CSX Transp. v. McBride*, 131 S.Ct. 2630, 2636 (2011)).

## ORDER

Having carefully considered the filings of the parties and record in this case, and for the reasons set forth above, it hereby ORDERED:

1. Plaintiff's Motion for Partial Summary Judgment (Dkt. 25) is **DENIED**;

2. Plaintiff's Motion to Strike Affidavit in Opposition to Motion (Dkt. 41) is **DENIED** as **MOOT**[19];

3. Plaintiff's Motion for Leave to File Declaration of Tim Santillanes (Dkt. 46) is **DENIED** as **MOOT**[20];

---

[19] Plaintiff seeks leave to file a declaration to support his claim that the EC-4 is a "vehicle" under the FSAA. (Dkt. 46-1.) However, as set forth above, although the EC-4 may constitute a "vehicle" under the FSAA, it is not a "locomotive" under the LIA.

4. The Parties' Joint Motion to Continue Trial (Dkt. 58) is **GRANTED** for good cause. The May 12, 2015 jury trial is vacated and reset for September 29, 2015 at 9:30 a.m. at the Federal Courthouse in Pocatello, Idaho.

DATED: March 13, 2015

_____
Edward J. Lodge
United States District Judge

---

[20] In response to Plaintiff's Motion to Strike, Union Pacific amended the offending portion of the Declaration of Charles N. Richardson regarding whether an EC-4 is a roadway maintenance machine. (Dkt. 54.) The Motion to Strike is accordingly moot. Further, the Court did not rely upon Mr. Richardson's conclusion that the EC-4 is a roadway maintenance machine in deciding Plaintiff's Partial Motion for Summary Judgment.